The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Be seated, please. All right, the first case we're going to hear this morning, Paradise Wire v. Weil, and Mr. Abraham, we'll hear from you.  May it please the Court. Jeffrey Abraham representing appellants who are plaintiffs in the case below in the district court. In terms of a broad overview of the case, plaintiffs are former shareholders of American Realty Capital Retail Centers of America, which we call RCA, and they received 0.385 shares of an entity called American Finance Trust, or AFIN, and 95 cents a share in a merger engineered by defendant AR Global, which is a controlling general partner of both RCA and AFIN. The merger itself was effectuated pursuant to a proxy, which was part of a registration statement filed with the SEC, and the gravamen of plaintiff's claim is that the proxy made materially misleading or false statements, and as a result, plaintiffs have been damaged. The appeal comes to this Court after the district court dismissed the case without benefit of oral argument on a Rule 12b6 motion. The issues on the appeal are whether plaintiff plausibly alleged that the proxy contained any material misstatements or omissions, and secondarily, whether plaintiffs can pursue claims arising under Section 13e of the Securities Act, Securities Exchange Act of 1934. As your Honors know, a de novo standard applies on this appeal since it was a decision on a Rule 12b6 motion, and on the underlying Rule 12b6 motion, the claims are subject to a plausibility standard, which requires the Court to accept the well-pleaded allegations as true and construe the facts and reasonable inferences in light of the most favorable to the plaintiffs. In terms of material statements in the proxy that are actionable, I'll take first the statement that AFIN's NAV, as of December 31, 2015, was $24.17 a share. The test for materiality, based upon the Third Circuit decision in Quaker Oats, would be whether the constant repetition of this $24.17 NAV number created the reasonable understanding among investors that it was of considerable significance. And I don't think that you can deny that that's the case here, because not only is it repeated constantly, it's on the cover page. Yeah, but it seems to me, take that value out of context, even though it's repeated, it was the last computed NAV, and they said, they dated it, they explained it, and anybody reading it knew it was as of December. What was the date of the proxy? It was the following year. It was in the... It was in December... Well, the NAV was as of December 31, 2015. As of December 31, 2015, was issued in March 2016. It was the last available, yeah. It was the last available NAV, but it was a material fact. Sure, it's a material make. That's why they listed it, but somebody reading it knows that it's three months earlier, and a lot happens, and they're not oblivious, a reasonable investor. Well, let's assume that's true for a moment. It's still a material fact that triggers a duty to disclose other material facts. Don't they say they're not going to do that? Don't the documents say they're not going to update it? It not only dates it back to the date it was effective, they say that things could change, and they say we're not going to update it. Well, assume that they can disclaim a duty to update. There's the issue of what the value was, and there's an issue of other things that happened at the company that could be material, aside from an actual number of NAV. What is the basis of your assertion that there is a duty to update? It would be within the statute itself, and based upon issuing those 425s, which were updated solicitations to shareholders. But if, but not if one, there is no requirement that one do so with respect to an NAV that is calculated. That's true, but the NAV contained, here's the point. It triggered a duty to disclose material facts. Such as that it was dated. Not necessarily just that it was dated, but facts that were contrary to 2417 being a valid number. And the most prominent of those facts is the Merrill Lynch property sale, and that was one of the largest groups of properties that they owned. And it was sold for $148 million, which is not an inconsiderable sum of money, especially in the context of AFIN. And it was sold at a capitalization rate of 8.6%. All of that was disclosed. What? All of that was disclosed. I don't believe that the capitalization rate of 8.6% was disclosed. You could compute it, right? I don't think you could compute it in the proxy. And if you could, you could not compute it in the proxy. And the law does not demand the skill of a financial analyst from a retail investor, based upon the Virginia bank shares case. The only reason that you argue is that it's improper, because the capitalization rate is higher than the rate that's assumed for the other assets. The average rate. But it still fell within the range, didn't it? Well, it fell within the range, but it was a significant sale at the higher end of the range. And it strongly suggested that the correct valuation method was at a higher end of the range. It would be a material fact that a reasonable shareholder would like to look at. And certainly it's plausible, a reasonable shareholder. What do you want him to say? We sold the Merrill Lynch properties. It was our fourth largest group of properties for $148 million, at a capitalization rate of 8.6% compared to the 6.09% we have assumed for the 2417 NAV. Well, they didn't spell that out, you say. It was misleading. Well, not only didn't they spell that out, Your Honor, they didn't spell out the 8.6% capitalization rate. You might have to use a calculator or something more than that and flip through a whole bunch of pages, and perhaps even another SEC filing to figure that out. Why isn't that part of the financial changes in the company, that while maybe not specifically disclosed, are disclosed ad nauseum through the proxy statement? Well, I'm not sure that this is a... These aren't just financial changes. These are transactions and specific events that impact the reasonable investor's perception of the value of the company. Isn't that exactly what they said could happen, and that investors should not construe the representations that were made not to be affected by it? Thank you for that question. It's not just that it could happen. It did happen. And that's the difference, because there's a risk that something could happen, and there's something that actually happened. And it goes back to what late Judge Pollack said. It's a difference between saying that, well, you're about to, you know, step in a... You might step over a ditch and, in fact, it's the Grand Canyon. Is there... Do you have a case... Because I tried to read the cases that were cited where you had events like this where you had allegations... where the allegations were not stated to be inaccurate at the time, but in essence became inaccurate based on subsequent events, where you have this level of disclosure? Well, let me... Your Honour, at the time... Let's draw where the time is. The time of the NAV is 24-17. The time of the disclosure is when the proxy comes out in 2016. These events had already occurred by the time the proxy statement came out in December 2016. So it's not really a duty to update. These are existing facts that impact the issue of how much AFIN is worth, and, by the way, also how successful Enterprise is. They weren't withheld. All you're saying is they should have done a calculation that could have been done by anybody, even though it fell within a rate. Your Honour, I'm not sure that that calculation could be done by anybody. This was an investment held widely by individual investors. It was not a publicly traded security. It wasn't actively followed by securities analysts. So you're saying this is a subsequent occurring fact that was material. They disclosed the fact. They disclosed the sale. They disclosed the amount of money. They disclosed the date. They disclosed the NAV as of December 31. The question is, you want them to spell out that this was a good investment, this is not a good investment. I don't know quite what you want them to say other than what they disclosed. Your Honour... Except you say the capitalization rate. With all due respect, they disclosed the amount of the sale, but that wouldn't have enabled somebody to figure out the capitalization rate. And I would also refer, there's also the SunTrust impairment. SunTrust was the largest tenant. The district court, in a rather exhaustive statement of facts, found that the AFIN had incurred cumulative net losses equal to $62 million between January 2013 and September 2016, which encompassed all but three months of the losses that you flagged in your complaint. And although it didn't directly reflect the losses with respect to SunTrust, it did more by encompassing all the losses that the AFIN had suffered over three years. Let me answer that question, Your Honour. Is it clearly erroneous? Is it... De Novo is the standard, but yes, Your Honour, because in real estate investments of this sort, the relevant financial metric is not an accounting loss, it's cash flow, which is reflected in funds from operations and modified funds from operation. So the fact that there was an accounting loss was really not of major significance and the proxy focuses on funds from operations. And the impairment of an asset and the ability to generate cash flow from an existing asset is a material fact, especially when one considers it's from a group of properties that is the largest tenant of AFIN. Do you dispute that as a fact? Dispute what as a fact, Your Honour? The district court's statement. I don't dispute as a fact that the company had cumulative losses. I just... Of the amount that she, that were identified, is the statement false? Do you dispute the... I don't dispute that the district court got those facts right. But it's still materially misleading because the relevant metric that an investor would look at is cash flow from operations. Well, but it's what you want seems to shift based on what the argument is. You object to find it, you object to the conclusion about the AFIN, but when one looks at that more clearly, it appears that it was addressed. And the same seems to be the case with the NAV. It was accurately reflected as of the date of the last available NAV. And Your Honour, I'd like to reserve some time for rebuttal if possible, but it may have been the last, it may have been accurate as of December 31st, 2015. It certainly was... Well, that was all it was reflected to be. Well, and except for every adverse fact that happened between December 31st, 2015 and... But that was, but it was reflected as such. It wasn't supposed to capture those things. Well, I guess... It made it very clear that it did not. I guess, Your Honour, you could ask yourself this question. What was the incentive for shareholders of RCA to vote for this merger? And it was specifically marketed based upon the premium they were supposed to receive based upon the 2417 NAV. Your Honour, I'd like to reserve some time for rebuttal if possible. Thank you very much. All right. Webb. Good morning, Your Honours. My name is Stuart Webb. I'll be making the argument this morning on behalf of all of the defendants. I think, Judge Niemeyer, you heard, you asked about the standard of appellate review. It is at the nouveau standard from a motion to dismiss, but the one point I would add to that is that the court, Judge Blake, in considering the motion to dismiss was entitled to consider all of the documents that are referenced in the complaint and that were submitted as exhibits. There was no objection to the motion to dismiss. The proxy was attached to the complaint, wasn't it? The proxy, I don't believe the proxy was attached, Your Honour, it was referenced. It was referenced extensively to the complaint and I believe the defendants submitted it as an exhibit in the motion to dismiss. And this is a proxy that is 200 plus pages in text and then there's another 550. The point is, the fact that you attach it to your response doesn't help. The question is, this is a 12B6. It's still, and that's my point, Judge. The sufficiency of the complaint is the standard and your argument has to be that the complaint is based on the proxy. That's correct, Your Honour. That's correct. And the other point I would add, Your Honour, nobody disputed that and in fact, when we submitted the proxy as an exhibit and other exhibits in the motion to dismiss, the plaintiff countered by submitting other exhibits as well. So there was no argument made that this was not a 12B6 motion or that the proxy could not properly be considered. And as I say, the proxy is some 200 plus pages of text describing the transaction plus another 550 pages of financial information and the merger agreement and the banker statements. So to the point that was discussed this morning, the proxy specifically discloses, and I'd urge the court to look at the risk factors in the proxy, which are at, I think, 126 and 127 pages of the joint appendix. The proxy specifically discloses that the net asset value was determined for AFIN and I should correct myself because it's what's referred to correctly as a estimated per share net asset value of AFIN, the company that was doing the acquisition. It is specifically stated throughout the proxy that that net asset value was determined  It is also stated throughout the proxy that AFIN, and frankly the same is true with regard to RCA, the acquiring company, that the net asset value is determined on an annual basis. So to the questions you all were asking this morning, it is correct that the net asset value was determined on December 31st, 2015 and at the time of the merger agreement, which was in September of 2016, and at the time of the proxy statement, which was in December of 2016, and at the time of the shareholder vote in February of 2017, the only net asset value determined was the one that was published in March of 2016 for December 31st, 2015. So when I hear we should have disclosed more about the net asset value, the estimated per share net asset value for- I think his, if I understand his argument, is that you did disclose the NAV, as of December 31, and it is disclosed that that is not a current NAV. But his argument is that what occurred thereafter would have an impact on the NAV and that was not adequately disclosed. And with respect to the transaction of Maryland properties, I think his main argument seems to be that you didn't disclose the higher capitalization rate and so let me talk about that then. First of all, I heard that the Merrill Lynch, what's referred to as the Merrill Lynch transaction, the Merrill Lynch transaction was a huge transaction, the largest number of properties. AFIN, as of December 31st, 2015, as the proxy discloses, had 464 properties. The Merrill Lynch transaction involved three properties, located in one town, I think it's Hopewell, New Jersey, in one state, New Jersey, rented by one tenant, Merrill Lynch. It was an arm's length sale to a third party. There was no capitalization rate used for that transaction. This was a negotiated arm's length sale between AFIN and a third party that was buying three properties and they negotiated a purchase price. Did he come up with 839 or whatever number he came up with? This is gonna test my accounting a little bit, Judge Niemeyer, but the concept of a capitalization rate is something that is used in order to try to value, particularly these types of companies, non-listed REITs, real estate investment trusts, and what you do to come up with a capitalization rate is you take the net operating income of the REIT and then you try to, you bring in experts. Let me look at the- It's based on how many years, Eureka, you're going to project that cash flow to get to a value. To some extent, so if you look at what's described at 151 and 152 of the proxy, where they describe how Duff & Phelps, which is the outside appraisal that was brought in to assist with NAV number for December 2015, what they do is they look at leases that are longer than seven years. For those, they use the income capitalization rate and that's exactly what they do, Judge Niemeyer. They look at the revenue that's coming in from those properties for the next seven years or longer and they try to value that and they use their judgment to come up with capitalization rates. If the property's less than seven years, they use a discounted cash flow method. So that's the difference here. What you have, though, is 391 properties owned by AFIN located in 37 states throughout the country that were leased to multiple tenants and that's the capitalization rate to which the 6.09 was applied. But is there, I appreciate disclosures and I'm familiar with those, but with the Merrill Lynch, we're talking about $17.5 million negative effect. With the Sun Trust, we're talking about $27 million and the proxy talks about three years of like 62 million. So those two transactions do amount for a significant loss. Is there some level, even with appropriate disclosures, that reaches a level where you do have a duty to disclose? There's not on that, Your Honor, there's not because as I think was pointed out in the questioning this morning, the financial terms of the Merrill Lynch transaction are fully disclosed in the proxy. I know there's a dispute in the briefs about whether you can use an 8K that got filed in early December. You don't even need to look at that. I think you can because that was filed as both an 8K for AFIN and as a Rule 424 supplement for RCA, but past that, look at the, it's a Part F, I think it is, that is an appendix to the proxy. Look at the pages there, I think it's 311 and 312, where they talk about the impact of the Merrill Lynch transaction on AFIN. And so to your point, Judge Quattlebaum, there's a disagreement as to whether or not there was a $17 million loss. But those numbers are there. You can look on those pages in the proxy and you can see, because the disagreement is the Merrill Lynch properties were acquired when they were purchased for about $65 million. They sold for $48 million. So if you want to say that's a loss, it's right there, because the sale price of $48 million is shown and the $65 million acquisition cost is shown. What is also shown, though, is that there was depreciation for those Merrill Lynch properties over the years of $27 million. If you take the depreciation out, which I'm told is required by GAAP accounting to determine whether it's a gain or loss, if you take that $27 million of depreciation out of the $165 million, then you come up with a gain of $4 million. So either way on those points, Judge, the facts are there. The shareholders can read those materials and the shareholders can make that determination. Could I ask about your reliance on Rob with respect to future projections not being actionable and the extent to which it survives the Supreme Court's decision in Omnicare? I actually think Rob probably anticipated much of the Supreme Court decision in Omnicare in the sense of there's some more hoops, maybe, that have to be gone through for Omnicare. But basically what Rob said, and I think Judge Blake recognized, is that projections as to the future are not the sort of thing that makes out a securities law violation. And what Omnicare does is talk about their opinions, and clearly those projections are opinions, Your Honor. Their opinions, there's no allegation in the complaint that those opinions are subjectively false. There's no allegation in the complaint that those opinions are objectively false. So I think the answer to all that is under the analysis. Even they can't omit material facts. I thought that was the way. I think that what Omnicare talks about is the opinions, the projections in this case, have to be sincerely believed by management. There's no allegation that they're not. I think Omnicare then goes on to a second point that if the work wasn't done to come up for a good faith basis for those projections, that may be another problem on the second part of Omnicare. But again, there's no allegation to that effect. And in truth, if you look at, which is also part of the record, if you look at the 2016 Form 10-K that was filed for AFIN, what you will see is that the projections on what are referred to as the funds from operation and the modified funds from operation, actually in 2016, AFIN exceeded or met those projections. Don't, doesn't Omnicare, in addition to, you know, creating some potential liability for a future projection if certain facts are omitted, also require the analysis of those alleged representations to be read in context with the whole proxy and any disclaimers or warnings related to it? Yes, Your Honor. And if you look at where the projections are given, what you see is there are a multitude of qualifications, disclaimers, and conditions. In fact, those projections are given only because they were given to the special committees that were formed by both companies to negotiate this transaction and given to the bankers. And what- The proxy statement also says they won't be updated. That's right. That's right. And the proxy statement says they are not necessarily, to your point, Judge Duncan, they're not necessarily predictive of future events. Their management's best judgment as to what they think, but they're not necessarily predictive and you should not rely on them for that. My understanding of your reconciliation of Rob and Omnicare is that Omnicare does make for a slightly more stringent requirement, but you believe the facts are omitted? Yes, that's correct. I mean, what Omnicare says, essentially, is if you have a, if there's a sincere belief as to projections or as to opinions, then the only way that there's liability for that is if the plaintiff can plead and prove subject falsity and objective falsity of those opinions. And I think that's consistent with Virginia bank shares. There's no allegation of that here. And I guess I get outside the point a little bit when I say, if you look at the 2016 Form K, those projections turn out to be within the ballpark. I think the projection for FFO was some 60.2 million or so and the actual FFO for 2016 was 73. MFFO was 70 was projected and 73 was the actual. So they're not even objectively false, Your Honor. And there is the sub, the part I think that the Judge Quattlebaum was asking about a nominee of, if you haven't done, if you don't have a reasonable basis, I think in Omnicare, the question was, did they comply with the law? The company said they did comply with the law and the example that the court uses, but if they didn't talk to a lawyer or if the lawyer told them, hey, you're not complying with the law, but they say, oh, but we believe we're complying with the law, that wouldn't be a good faith basis and that would create liability. But that's not this situation. I mean, here you have projections given that are clearly qualified by the language of the proxy. The other part of that that I should note is the proxy, Judge Blake concluded that even without information about the, additional information about the NAV, the proxy leaves no room for a reasonable investor to believe that AFIN is a financially healthy company or a company poised for financial growth. And that's why I say, look at the appendices to the proxy where you see the historical financial information. If you look at all of that information, what you see is, as Judge Blake noted, there's been $62 million of losses already. The losses in 2016 are on pace to be greater than 2015. I feel bad stating I'm talking down about my client at this point, but the losses are mounting. So the proxy discloses, they're not the audit advances because they're only for the nine months ended September 30, 2016, but the proxy discloses that at September 30, 2015, AFIN lost, on a per share basis, 12 cents. On September 30, 2016, AFIN lost 29 cents per share. So to say that somehow the projections create a suggestion that this is a growing company, I mean, Judge Blake clearly read the proxy and said, how can you look at all of these losses and say this is a growing company? So I think that the proxy fully discloses that the NAV was determined as of a particular date, that subsequent events might affect that, it was not being modified for that, and there was nothing to disclose because there was no new NAV. The other thing in that context is that- Can I interrupt you on, the plaintiffs made a point in their briefs that the requirement that the closing of the transaction take place by March 6th, I think, was indicative of the way in which the proxy was misleading because that date preceded the filing of the 8K where a new NAV would be disclosed. What's your position in response to that? That's just wrong, is my position, but let me explain it a little bit. What the proxy says is that if the SEC has not approved the proxy by a certain date, the drop dead date becomes March 6th, although the parties may extend that if they elect to, or waive that. And then if the SEC hasn't approved the proxy by that date certain, then the timing gets extended and the last date for the drop dead date, if you will, is April 3rd. So, yeah, you can mine, and you can see this in almost any case, your honor, you can mine a 200 plus page proxy and all the exhibits, and you can find things that you want to glom onto and pick out. You can find things like the non-gap measures and the projections of FFO and MFFO, but they fly into face, just as the suggestion that this had to be done by March 6th when in fact there was leeway in there all the way through to April if it had to be. You can always mine something if you want to, but taking, going back to Judge Duncan and the projections, taking the projections of two non-gap measures that somehow alter the total mix of information when you've got all the gap information out there about how these companies are doing makes no sense. I mean, the proxy fully disclosed the information and Judge Blake was clearly correct on concluding that the new claim under the securities laws. I'll turn really quickly, if I may, to the 13E issue. Plaintiffs now try to create, have the court create a judicial cause of action, implied private right of action under 13E. I think Judge Blake didn't reach that issue because she found the pleading defect in the papers, and that pleading defect still exists. That pleading defect is in order to bring a transaction within 13E, the transaction has to have a purpose or likelihood of extinguishing, terminating, or suspending a class of securities. That's never alleged. Aside from those predicate issues about whether this is a going private transaction or whether there is a private cause of action, are there any alleged misrepresentations regarding that count that aren't also covered in the first count? I don't think there are, Your Honor. I think what Mr. Abraham will tell you is, oh, but under 13E there's more information that would be given out. I think all of that information is, if it's not expressly given in the proxy, it is the information that's included within the scope of what the proxy talks about. So I don't, I think Judge Blake also ruled that it was, it duplicated the 14A claim and she was right in that regard. On the question of whether this court should be the first court since the Sandoval decisions to recognize an implied right of action, I think Sandoval, as Judge Bennett in the District of Maryland noted in one case, it's a sea change. And it's leading up from other cases in the Supreme Court. But basically, in order to have an, the Supreme Court has cautioned that it is not the role of the judiciary to develop implied causes of action. That's the role of Congress. And you look to the structure and the language, principally the language of the statute. And here, the language of 13E is, it shall be unlawful to, and it prescribes conduct. That is, this court in the Newcomb case in an en banc decision viewed language like that of it shall be unlawful as, I think the term the court used was singularly prescriptive. And by that I mean it's prescriptive of conduct, not rights creating, where Sandoval said, had to be rights creating language, language creating rights, and language creating remedy. And that's just not here in this statute. And the one court that the plaintiffs rely on is a Sixth Circuit decision from Howing. One of the judges on that panel, in a subsequent dissent in that case, not related to this, but did draw into question whether Howing should have recognized in 1989, I think it was, an implied cause of action under 13A, suggesting that maybe it shouldn't. Because you look at the language, it is not rights creating. And perhaps the best way to illustrate that is to draw a distinction between the decision of the Supreme Court in the Transamerica case, which involves section 206 of the Investment Advisor Act, and the decision of the Supreme Court in Cannon versus University of Chicago under the educational amendments. In Transamerica, the language was just as it was here. It shall be unlawful to defraud investors. In Cannon, and that was viewed to be non rights creating language. In Cannon, the language was, no person in the United States shall be subject to sex discrimination in connection with higher education. That says no person has, persons have a right. That's focusing on the rights of the persons as opposed to the conduct of the regulated entity. And I see my time is up. So with that, I would ask that the Court affirm the decision below. Thank you, Your Honor. Thank you, Mr. Webb. Mr. Heffern. In a certain sense, Your Honors, we're arguing materiality here. Well, actually, I had a question about 13E. Sure, Your Honor. Could you briefly address what I assume is your disagreement with the District Court's conclusion that you failed to adequately allege that the merger was the type of transaction that's covered by 13E? Well, I think that the stock was delisted and it's in a form 15, which we attach to our papers. It's an SEC filing of which one could take judicial notice. And that under basic notice pleading, we sufficiently allege that fact. It's not a requirement to plead with particularity. And I believe we adequately allege that fact. So I think- And your authority for that is sufficient, is your general reliance on notice pleading principles? Notice pleading, but also that we, it was, it is a fact. You can find it on sec.gov. We attached a copy of the relevant form 15 through which the stock was delisted. And if in fact, that is in fact the case, you'd have to actually ignore reality to say that we hadn't adequately alleged that. I mean, I would say that if that was, that would be a very technical defect, which I would hope we would have an opportunity to plead for if that was the real problem. I don't think, I just don't perceive that as an issue in this case. It's fact that it happened. But I'd like to address the materiality issue of the Merrill Lynch properties, because I think we're arguing materiality here of $148 million transaction. And the standard is plausibility, even though I believe it's material. The question is whether in fact we've plausibly alleged it. It's a $148 million transaction. It is not just three properties. It is 7.7% of the assets of AFIN. It's their fourth largest group of properties. It's separately disclosed in a Form 8 case subsequent to the time of the initial proxy statement. There is enough facts, there are enough facts here to plausibly allege that it's material. And getting to Judge Niemeyer's prior point that one could figure out the capitalization rate from the proxy, I don't respectfully, I would disagree. And I would point, Your Honors, to pages three and four of our reply brief. My question really was, you know it's, as I understand the capitalization rate, it's basically taking a current income stream and projecting it X number of years. And that's the judgment call as to how many years you project it in order to create value, right? And you divide by the... Certainly, Your Honor, my understanding is is that you're looking at a flow of income. And the question is, what's the appropriate capitalization rate? Meaning, let's say I have a bond that's yielding 5% and all of a sudden interest rates go up to 8%. I still get the same cash, but it's worth less because people would apply a different capitalization rate to it. And capitalization, a higher capitalization rate functions inversely with the cash flow. And knowing that the fourth largest group of properties, 7.7% of their assets sold for a much higher capitalization rate would plausibly, I mean, I believe it will be able to prove it was a material fact. How did you come to your number? Thank you for asking. Because if you look at page three, we have to piece it together from the proxy. There's a disclosure of the $148 million sale at page 13. AFIN recorded a $3.9 million gain. That's at page F15 of the proxy. You then have to flip to appendix page I-43 for the initial costs and accumulated depreciation of all the properties. And then you have to do a significant calculation, which perhaps I'm better at than maybe the average shareholder at RCA and our financial expert is better at that. And then only then could you come up with the 8.60% capitalization rate. With all due respect, I don't think that's full disclosure, especially to a broad group of relatively unsophisticated investors. I've always found this a little ironic that we have these proxy statements and other SEC filings that it would be hard for somebody who's a college graduate to read and understand. And then to say we have the reasonable investor. I would read a pretty sophisticated level to the reasonable investor, looking at these papers and trying to decide whether it's a favorable investment. Maybe you shouldn't substitute in, Your Honor, my level over my expert's level of sophistication with run-of-the-mill investors to whom this partnership or this investment was marketed to. This is like really mom-and-pop investors. It's an unlisted security. They get this proxy saying, hey, you're gonna get a premium. They're not given facts to establish that the most recent transaction is at a value which reflects a lower value for AFIN. They're not getting a premium. And in fact, had they liquidated, they would have gotten more money. And in fact, let me just say this in conclusion. This is not a theoretical case of picking through things. AFIN stocks publicly trades now. When we wrote the papers, it traded at 15. It trades under 14 now. If you take the value of the consideration the shareholders received, assuming $15 a share, you get to $6.72 and a half cents. The lowest range value of NAV for RCA reflected in the proxy was $9.03 and goes up to potentially $10.03. It's a 25% hit the average shareholder took here. These are material facts, at least plausibly alleged material facts, the MLP sale and the SunTrust matter. And the shareholders have suffered damages with plausibly alleged materially false or misleading statements. They didn't have the level of sophistication of financial analysts, as I understand your honor saying that he doesn't have it either. Well, mine was irrelevant to the considerations. You should not consider yourself irrelevant because at some level, you should expect many of the shareholders who receive this are less sophisticated than a law school graduate who sits on the US Court of Appeals for the Fourth Circuit, who hears many of these cases. We get to hear the two of you argue this case and we get directed to the very pages of the proxy statement and can then make some assessments. But my only observation was this is not an easy task. And when we talk about the reasonable investor, we must be talking about somebody that has some sophisticated knowledge as to how to read proxies and financial statements. I think your honor, in this context, you should look in the context of who the investment was marketed to. It was marketed to mom and pop investors. This is not a publicly traded securities. It's not followed by securities analysts. And it's just a different animal than the average publicly traded security. There is no way that an individual investor could have understood these facts without the benefit of a financial expert or somebody perhaps, I hate to say it, as savvy as me financially, perhaps as savvy as you financially. You have to piece it together, flipping through the proxy with the calculator to understand that there was an 8.6% capitalization rate for the Memler Earnest properties. Thank you, your honor. Thank you. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, Allyson K. Duncan, A. Marvin Quattlebaum Jr.